IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA


CHERYL SCHWARZWAELDER,            )
                                 )
              Plaintiff,          )
                                 )
       v.                         )        Civil Action No. 04-1879
                                 )        Judge Terrence F. McVerry
MERRILL LYNCH & CO., INC.        )        Magistrate Judge Lisa Pupo Lenihan
and METROPOLITAN LIFE            )
INSURANCE CO.,                   )
                                 )
              Defendants.         )


**MEMORANDUM OPINION AND ORDER**


**I. CONCLUSION**

The Motion for Summary Judgment filed by Defendant will be denied and the Motion for

Summary Judgment filed by Plaintiff will be granted, as Defendant Metropolitan Life Insurance

Company's ("MetLife" or the "Administrator") denial of benefits on remand constituted an abuse

of discretion in light of (a) the applicable Plan provisions and (b) the medical and occupational

evidence of the Administrative Record (the "Record").  This Court will grant Plaintiff's request

for summary judgement "on the issue of whether [Plaintiff] is entitled to a grant of long-term

disability benefits commencing May 3, 2004."  Plaintiff's Motion for Summary Judgment at 1.  It

will also grant Plaintiff's request for "interest, fees and costs".  Id. at 2.

## II. __DISCUSSION__

This case, which has been re-opened and is again before this Court following remand to the Administrator in December, 2006, involves the question of a long-term disability plan claim administrator's denial of benefits to a financial consultant. The consultant sought benefits under the language of a Plan providing them - in Plaintiff's circumstances, for a maximum of twenty-four (24) months - to an employee who is "unable to perform all of the regular duties of the Merrill Lynch job [s/he] had before [the] disability began and [is] under the continuous care of a doctor treating [the employee] within the scope of his or her speciality".[1] Presently before the Court are fully-briefed cross Motions for Summary Judgment.

Because the Administrator's denial of long-term disability benefits on remand constituted an abuse of discretion under the terms of the Plan, the Defendants' Motion for Summary Judgment will be denied and Plaintiff's Motion for Summary Judgment will be granted. More specifically, the Court has considered MetLife's (1) self-serving selectivity in its use and

---

1. See MetLife's Concise Statement of Material Facts in Support of Motion for Summary Judgment ("MetLife's Concise Statement") at ¶ 11. More specifically, the Plan provides for disability benefits (a) beginning after six months' absence owing to disabling illness and (b) continuing, where the disability is for mental health reasons, for a maximum of 24 months, at a rate of 60% of the employee's eligible compensation, with a maximum two-year total benefit of $72,000. A supplemental plan available to but paid for by the employee protected 40% or 60% of the employee's additional income, if purchased. See Record (hereafter "R.") at 128-38 (Merrill Lynch Disability Program plan documents/summaries).

The Court notes that the Administrative Record indicates that Plaintiff's annual salary was $600,000 or more and that she did not participate in the supplemental disability plan; *i.e.*, that the disability benefit for which she filed a claim was capped at $36,000 per annum for a maximum of two years (*i.e.*, $72,000). See R. at 11. Cf. R. at 218 (MetLife's Denial Letter of January 1, 2008 stating that Plaintiff's physician "did not adequately evaluate or address issues related to secondary gain . . . for your client leaving work"); R. at 322 (indicating that Plaintiff made in excess of $1M annually).

interpretation of the medical evidence, including reliance upon the solely paper-review reports of its consultants while giving scant weight to the contrary, more detailed, and consistent reports of Plaintiff's three treating/evaluating physicians, where the claim turned on Plaintiff''s mental health, and MetLife had discretion to supplement the medical evidence with independent medical evaluation ("IME"); (2) rejection of evidence self-reported by Plaintiff to her physicians where (a) MetLife had no basis for rejecting the treating/evaluating physicians' conclusions that Plaintiff's evidence was credible and (b) the Plan did not impose an evidentiary standard that excluded, *e.g.*, the treating psychiatrist's office notes of observations and reported symptoms and events; (3) failure to provide the consultants relied upon with all relevant evidence, *i.e.*, an accurate and complete profile of the scope and requirements of the job Plaintiff was usually/actually performing, (including, *e.g.*, requirements and conditions reasonably related to the disability alleged) and to obtain meaningful assessment of Plaintiff's disability under her Plan, despite this Court's express guidance to the contrary; (4) continued reliance on consultant's conclusions reached with reference to a standard of disability constituting an unreasonable interpretation of the Plan language and/or one expressly refuted by Defendant, and (5) failure to respond to the treating/evaluating physicians' conclusions regarding the impact of employment-related stress on claimant's medical condition.[2] The Court notes that an administrator's history of

---

2. See generally Metropolitan Life Insurance Company v. Glenn, 128 S.Ct. 2343 (June 19, 2008) (discussing assessment of abuse of discretion by consideration of case-specific factors); Elms v. Prudential Insur. Co. of America, 2008 WL 4444269, *8 n. 13 (E.D. Pa. Oct. 2, 2008) (discussing Glenn in context of prior Third Circuit precedent, and observing that Court's "touchstone" is to "mak[e] a common-sense decision, based on the evidence, whether the administrator appropriately exercised its discretion").

biased claims administration may also properly be considered in an abuse of discretion review,[3] but it did not find it necessary, in its abuse of discretion determination, to consider what weight, if any, should be given to MetLife's history as a long-term disability benefit claims administrator.[4]  The Court also notes, in reaching its case-specific recommendation, that (a) the Plan, as now interpreted by MetLife, provides a lenient disability benefit standard (*i.e.*, a claimant need only be unable to perform *any one* job function of *her own* position)[5] and, conversely, (b) the performance parameters of claimant's position were quite high.[6]

---

3.  See Glenn, 128 S.Ct. at *2351; id. at *2354-55 (Roberts, C.J., concurring) (noting that conflict of interest may be shown by evidence of improper incentives, such as bonuses to claims reviewers for "savings", or by "pattern of erroneous and arbitrary benefits denials") (citing Radford Trust v. First Unum Life Ins. Co., 321 F.Supp.2d 226, 247 (D. Mass. 2004)); Radford, *supra* (discussing pattern of erroneous and arbitrary denials, contract misinterpretations, and other unscrupulous tactics).

4.  Cf. generally, Adams v. Metropolitan Life Ins. Co., 549 F.Supp.2d 775 (M.D. La. 2007) (noting prior "admonishment" for arbitrary benefit denial); Glenn v. MetLife, 461 F.3d at 672, n. 4 (6th Cir. 2006) (noting that defendant had "cherry-picked" the medical records in a prior case). This Court has also previously had occasion to express disapprobation of MetLife's handling of particular disability benefit claims.  See Jagielski v. Met. Life Ins. Co., 2007 WL 2458139 (W.D. Pa Aug. 24, 2007), *withdrawn on joint request of counsel*, 2008 WL 1931424 (Apr. 29, 2008) (discussing procedural irregularities, evident biases and unfairness in review).

5.  See MetLife's Brief in Support of Motion for Summary Judgment ("MetLife's BSMSJ") at 7 (noting MetLife's interpretation of disability on remand).  It is not uncommon for a plan to require, *e.g.*, that the employee be unable to engage in any gainful occupation for which s/he is, or may reasonably become, qualified by education, training or experience.  See  Prior R&R at 10 n. 12 (noting the "vast number of disability benefit plans that have elected to condition benefits on a more clearly restrictive standard").

6.  See *infra* at 5-6.  Cf. generally Chapman v. Plan Adminstration Committee of Citigroup, Inc., 2008 WL 141632, *6 (W.D.N.Y. Jan. 14, 2008) (observing, in granting plaintiff's motion for summary judgment under arbitrary and capricious standard, that the essential duties of plaintiff's occupation as a "financial consultant" at large investment institution (Salomon Smith Barney) required him to be able to cope with market volatility and "concentrate and handle stress while managing large sums of money").

## A. **Statement of Facts and Procedural History**

1. Initial Benefits Review and Denial

As set forth in the November 21, 2006 Report and Recommendation adopted as the

opinion of this Court (the "R&R"), the long-term disability benefit plan at issue ("the Plan") was

established by Plaintiff's employer, Defendant Merrill Lynch & Company, Inc. ("Merrill Lynch"),

and is self-funded by Merrill Lynch, with claims administered by Defendant Metropolitan Life

Insurance Company.  The Plan confers upon the Administrator discretion as to both Plan

interpretation and determinations of benefit eligibility.  It is governed by the Employee

Retirement Income Security Act of 1974, 29 U.S.C. §1001, et seq. ("ERISA").  See Glenn, 128

S.Ct. at *2347 (noting that administrators "should consider a benefit determination to be a

fiduciary act (*i.e.*, an act in which the administrator owes a special duty of loyalty to the plan

beneficiaries")); id. at *2350 (observing that  ERISA requires plan administrators to discharge

their duty solely in the interest of the plan participants and beneficiaries and to provide a full and

fair review of claim denials).

Plaintiff Cheryl Schwartzwaelder ("Plaintiff" or "Claimant") was actively employed by

Merrill Lynch for approximately one year, *i.e.*, from approximately November 14, 2002 through

November 3, 2003, as a high-end broker and financial consultant responsible for approximately

$400-$500 Million in assets.[7]  Plaintiff represented that her treating psychiatrist advised that she

---

7.  Plaintiff was responsible for generating approximately $2M in new revenues annually.  See
Plaintiff's Prior Brief in Opposition to Motion for Summary Judgment at ¶ 18.  Cf. R. at 336
(MetLife Denial Letter including as essential duty "maintaining an acceptable level of revenue
generation and assets under management to meet or exceed agreed upon goals"); id. at 61 (May
2004 Report of Dr. Franzen, recounting that Plaintiff had been a broker for more than 17 years
and was the top female financial producer at her company nationwide).

was unable to continue in her high-stakes, high-pressure, high-performance-requirements position owing to increasing mental health difficulties, and that she therefore ceased work and sought disability benefits.[8]

The medical records initially before the Administrator indicate that Plaintiff sought treatment with Dr. Goubert, a psychiatrist, and was seen approximately every two weeks beginning November, 2003. Those records further reflect Plaintiff's Beck Depression Inventory and Initial Psychiatric Evaluation documents; Dr. Goubert's treatment observations/notes; Plaintiff's Patient Health Questionnaires; and Dr. Goubert's March 8, 2004 Attending Physician Statement.[9] Dr. Goubert diagnosed Plaintiff with severe depression. His conclusions regarding her impairments included decreased concentration, organizational ability, and memory; together with an inability to "engage in stress situations or engage in interpersonal relations [marked limitations]."[10] Dr. Goubert expressly diagnosed Plaintiff's mental health condition as resulting from "work-related stress" and recommended that she not return to work as a financial consultant.[11] The records indicate that Plaintiff underwent an extensive and varying trial of

---

8. As noted in the R&R, Plaintiff represented that, in following her treating psychiatrist's recommendation that she leave her career as a financial broker, she lost the clients she had developed. She also lost her annual income of $600,000 - $1M. (Her maximum annual long-term disability benefit was capped at $36,000 for two years. See supra n. 1).

9. See R. at 28-48

10. See R. at 44-5 (MetLife's Attending Physician Statement completed by Dr. Goubert).

11. Id. He specifically opined that Plaintiff was unable to perform her job duties "most notably because of [decreased] memory, [decreased] concentration and ability to organize" and "lack of ability to cope with stress" without becoming tearful.

pharmaceutical mental health treatment, including Zoloft, Lexapro, Remeron, Wellbutrin, Xanax, and Ambien.[12]

Plaintiff received short-term disability benefits from her employer for approximately three (3) months and her disability claim was referred to the Claims Administrator on February 20, 2004. The Administrator denied her claim approximately six weeks later, on April 7, 2004, by correspondence informing Plaintiff that there was insufficient documentation to support a significant "functional impairment that would prevent Plaintiff from performing all the regular duties of her job." See Defendants' Motion for Summary Judgment ("Defendants' MSJ") at ¶¶ 13-14; R. at 51-52.[13]

On April 19, 2004, Plaintiff's counsel notified the Administrator of Plaintiff's desire to appeal its denial of benefits. Dr. Goubert provided a letter of April 14, 2004.[14] In addition, on May 27, 2004, Plaintiff underwent a neuropsychological evaluation and testing performed by

---

12. See generally R. at 1; 249 (treating physician's statement that symptoms were "clearly stress related" and Plaintiff did not respond well to antidepressants).

13. The Court notes that this letter rather remarkably appears to deny benefits for disability related (in the treating physician's opinion) to severe *work-stress-induced* mental health symptoms because notes of her bi-weekly therapy indicated improvement while Plaintiff did not return to work. See R. at 52 (discussing Dr. Goubert's progress notes of December 2003 - March 2004 indicating that Plaintiff was feeling better; characterizing them as "*inconsistent*" with his Attending Physician Statement of March, 2004 (that Plaintiff was not recommended to return to her position); and concluding that because Plaintiff had "made improvements that would not support a functional impairment preventing an inability [*sic*] to work", her claim was denied) (emphasis added). Cf. Evans v. Unumprovident Corp., 434 F.3d 866 (6th Cir. 2006) (noting, in discussion of insurer's arbitrary benefit denial, that claimant whose medical condition was exacerbated by work-related stress experienced improvement in condition on leave).

14. See R. at 108-09 (noting that Plaintiff had some improvement, but had not returned to baseline, and it did "not seem appropriate" to recommend that she return to work).

Michael Franzen, Ph.D., the Chief of Psychology and Neuropsychology of Allegheny General Hospital.[15]  Dr. Franzen concluded that Plaintiff was suffering "very high levels of psychological distress related to anxiety and depression."  He diagnosed her condition as severe adjustment disorder, stating that she was "markedly limited in her ability to perform complex cognitive operations" and that her cognitive state was "significantly compromised by her emotional state" and this would "significantly interfere with and limit her ability to perform at the high level of functioning she previously reported."[16]

The Administrator obtained a medical file review/assessment (a "paper review") from Mark Schroeder, M.D., a psychiatrist, who concluded, in September, 2004, that Plaintiff had failed to "substantiate a severity of illness or impairment that would be expected to preclude [her] from working at her own occupation".  R. at 95.[17]  At Dr. Schroeder's request, a paper review of

15.  See R. at 61-64.  Dr. Franzen notes Plaintiff was 45 minutes late, initially anxious and disorganized, and intermittently crying.

16.  See id.  Dr. Franzen's neurocognitive evaluation placed Plaintiff's verbal IQ in the 63rd percentile; performance IQ in the 37th percentile; and full scale IQ in the 53rd percentile.  Her verbal comprehension score was in the 32nd percentile and her perceptual organization score in the 37th percentile.

17.  Dr. Schroeder, in reaching his conclusions, observed that Plaintiff's medical records "did not document severe psychiatric symptoms, such as suicidal or homicidal thoughts of intent or plan, psychotic or manic symptoms, or severe panic attacks with agoraphobia that may reasonably support severe impairment".  Nor did they "document an intensive psychotherapy treatment plan or . . . referral to more intensive treatment such as a partial hospital program or intensive outpatient program." R. at 95 (September 2004 Report).  See also R. at 394-96 (August 2004 Report).

The R&R *cautioned* MetLife  that these remarks suggested that Dr. Schroeder conflated disability under the Plan with general disability for, *e.g.*, purposes of Social Security benefits, or otherwise improperly elevated the qualifying threshold in evaluating Plaintiff's medical records. It reminded MetLife that an Administrator may not, of course, reasonably base a benefit denial
(continued...)

*Dr. Franzen's evaluation only* was obtained from John Shallcross, Psy.D., a psychologist, who opined that (a) Plaintiff's "observed symptoms . . . in the Mental Status Exam [were] not sufficient to suggest a major depressive disorder and such a disorder [was] not diagnosed", (b) the decline in IQ estimated by Dr. Franzen exceeded that normally anticipated due to an adjustment disorder, (c) the testing did not outline specific restrictions/limitations on employment, (d) the limited observed symptoms were "not of a severity that would indicate *preclusion of all work capacity*". . .", and (e) generally, Dr. Franzen's conclusions regarding Plaintiff's significant cognitive compromise were not "borne out by" the test data.[18]

The Administrator upheld its denial of benefits on September 23, 2004, reiterating that the "available records submitted for review" did not "substantiate psychiatric functional impairments that would "'preclude [plaintiff] from performing all of the regular duties of her Merrill Lynch job'. . . ." R. at 104. Compare Plaintiff's Prior Brief in Opposition at ¶¶ 26-27 (attesting that Defendants never asked Plaintiff about her specific job duties, the "full scope" of her position, or the level at which she was expected to perform) with September 23, 2004

17. (...continued)
on the opinion of a consult who "reads out" (literally *or* effectively) the "disability from own occupation" parameters of the disability benefit plan. See R&R at 12, n. 15.

18. See R. at 84-87 (September 2, 2004 Consultant Review report) (emphasis added). As noted above, Dr. Shallcross' report indicates that he only reviewed Dr. Franzen's evaluation and that he assumed a disability standard at odds with that of the governing Plan.

Cf. R. at 248 (November 21, 2007 Letter of Dr. Goubert in defense of his assessment of disability, stating that he was unfamiliar with Dr. Shallcross' report but that "if Dr. Shallcross failed to take into account [Dr. Goubert's] or Dr. Franzen's clinical findings, or the specific job duties [Plaintiff] was actually performing, . . . his report would have little or no significance to [Dr. Goubert] as [Plaintiff]'s treating psychiatrist").

9

MetLife letter (noting that Plaintiff's "occupation as a financial consultant is categorized as a sedentary exertion level occupation").[19]

2. <u>Prior Proceedings Before the Court</u>

The initial action was filed on December 15, 2004.

In considering the Defendants' Motion for Summary Judgment, it was unclear to this Court whether the Administrator interpreted the Plan language requiring that a claimant be "unable to perform all the regular duties of [her] Merrill Lynch job" to mean disabled from (a) "one or more" regular duty, or (b) "each and every" regular duty. Indeed, the Administrator took strikingly inconsistent positions on this question during the prior proceedings. <u>See</u> R&R at 9-12.[20]

The case was therefore remanded to the Administrator for an express statement of its interpretation of the Plan language and, if necessary, reconsideration of Plaintiff's disability claim in light of that interpretation in the first instance. The Court further suggested that, if the Administrator adhered to its denial of benefits, it should clearly define the Plan interpretation applied, and articulate its basis for denial with reference to Plaintiff's individual job requirements.

_____

19. Plaintiff referenced the correct standard in this Circuit (and others). <u>See</u> <u>Lasser v. Reliance Standard Life Ins. Co.</u>, 244 F.3d 381, 386 (3d Cir. 2003) (defining claimant's regular occupation as "the *usual work that the insured is actually performing* immediately before the onset of disability") (emphasis added). <u>Cf.</u> <u>Elliott v. Metropolitan Life Ins. Co.</u>, 473 F.3d 613, 618 & n.5 (6th Cir. 2006) (noting that denial of benefits in reliance on "a general notion of 'sedentary' work rather than on the duties that [plaintiff]'s occupation entailed", as required by plan, was erroneous).

20. <u>Cf.</u> <u>Glenn v. MetLife</u>, 461 F.3d 660 (6th Cir. 2006) (noting that inconsistency of MetLife's litigation positions was relevant in review of denial for arbitrariness).

3. <u>Benefit Review on Remand and Denial</u>

On remand, the Administrator interpreted the Plan to require only that Plaintiff evidence disability from any one regular job duty.[21] MetLife obtained a copy of the *pro forma* description of the financial consultant position from Merrill Lynch.[22]

MetLife also obtained a file review by Dr. Keven Murphy, a psychologist, who, by Report of May 16, 2007, opined that Dr. Franzen's neurocognitive testing had failed to include measures to assess malingering and that Plaintiff, given her test scores, retained the cognitive abilities to continue work in her own occupation without restrictions or limitations.[23]  Plaintiff's physicians,

---

21.  <u>See</u> MetLife's Concise Statement at ¶ 12 (explaining the definition as whether Plaintiff demonstrated that there was "one or more of her regular job responsibilities that she could not perform").

22.  Merrill Lynch's description of the essential duties and responsibilities of a financial consultant includes (1) asset gathering/profile (including prospecting by telephone, mail and personal visits to generate new accounts; and determining the assets and needs of prospects and discussing recommendations with them; (2) interpreting information (including assimilating and interpreting information on "market conditions, specific securities, other investment products, and tax/legal considerations to match the investment needs of the client" with Firm products/services; reading research reports; and monitoring stocks and options); (3) account servicing (including maintaining client relationships and reviewing investment portfolios with them); and (4) asset allocation/asset management (including presenting and persuading clients to act on recommended Firm products/services - planning sales strategies, preparing product recommendations, and adhering to compliance regulations).  <u>See</u> MetLife's Concise Statement at 1-2; MetLife's BSMSJ at 5; R. at 376 (MetLife Diary Detail of 4/17/07 listing "Job Description Details").  <u>See also</u> R. at 376  (MetLife Diary Detail - "Job Description Details" - summarizing position as "generates profitable income to the firm through the prospecting, development and servicing retail accounts, provides a wide range of investment advice and ideas to aid clients in meeting their investment objectives").

23.  <u>See</u> MetLife's Concise Statement at ¶¶ 26-31; R. at 371-73 (May 16, 2007 Report of Dr. Murphy); 345-48 (June 5, 2007 Addendum Report of Dr. Murphy).  Dr. Murphy's Report consists of 2-1/2 pages.  The first two pages are a reiteration of the medical evidence.  The subsequent paragraph addressing MetLife's question, *i.e.*, whether plaintiff had "restrictions that prevent [her] from performing the sedentary work activity of a financial consultant" consists of

(continued...)

Dr. Goubert and Dr. Franzen, each responded, advising that they disagreed with Dr. Murphy's report.[24]

---

23. (...continued)
several more sentences reiterating the evidence and a few sentences of conclusory assertions that Plaintiff "demonstrated the cognitive ability to perform the work of a financial advisor" and "retained the self-confidence to work with the public". Dr. Murphy's conclusions appear premised on Plaintiff's generally "within normal" or "average" neurocognitive scores. See R. at 373. Cf. *supra* n. 16 (test scores). Cf. also Elliott, 473 F.3d at 619 (noting, in discussing absence of reasoned determination, that MetLife's paper-review consultant's report was comprised largely of recitation of the contents of claimant's medical evaluations) (citing Kalish, 419 F.3d at 509) (rejecting as inadequate a report recounting six pages of medical history and engaging in only one page of analysis)).

Moreover, Dr. Murphy concludes, with no discussion *whatsoever* of specific job duties, that Plaintiff's "psychiatric symptoms did not preclude work in her own occupation". As expressly discussed in the R&R, preclusion from all the duties of one's position and preclusion from any one of those duties are significantly different disability standards. Cf. Elliott, 473 F.3d at 619 (noting that consultant's failure to discuss job duties "implie[d] that he did not conduct a reasoned evaluation of her condition to determine whether she could perform" them).

Finally, the Court notes that, as discussed *infra*, while Dr. Murphy opined that stress had not cognitively disabled Plaintiff from her occupation, he did not address Dr. Goubert's conclusion that Plaintiff's mental health disability from work-related stress *itself* had disabled her from return to a financial consultant position. Cf. R. at 336 (MetLife's summary of Dr. Murphy's report in its Denial Letter of June 8, 2007); McGuigan v. Reliance Standard Life Ins. Co., 2003 WL 22283831, *6 (E.D. Pa. Oct. 6, 2003) (discussing inappropriate, selective emphasis on physical capacity while "ignor[ing treating physician's] conclusion [regarding] risk occupational stress posed to" plaintiff's health).

24. See R. at 361-62 (Letter of Dr. Goubert reiterating that Plaintiff had continuing difficulties with depression and anxiety, as well as sleep, memory, concentration, motivation, disorganization, distractability; noting Dr. Franzen's conclusion that Plaintiff was suffering "very high levels of psychological distress related to anxiety and depression"; and restating his own conclusion that Plaintiff could not fulfill the "duties of her fast-paced, stressful, cognitively-demanding job").

In June, 2007, MetLife again denied Plaintiff long-term disability benefits.[25]  Plaintiff

appealed and submitted additional August, 2007 correspondence from Drs. Goubert and

Franzen[26] and an Affidavit dated August 17, 2007.[27]   Plaintiff also was personally examined by

Dr. James Merikangas, a Clinical Professor of Psychiatry and Behavioral Neuroscience at the

George Washington University School of Medicine.  Dr. Merikangas concluded that the type of

"decompensation" Plaintiff described in detail was "perfectly typical for patients suffering from

---

25.  See MetLife's Concise Statement at ¶ 39 (citing MetLife's letter of June 8, 2007, advising Plaintiff that the evidence of record "did not demonstrate any functional impairment resulting from a psychiatric disorder that would prevent [her] from performing any of the material duties of her occupation as a Financial Consultant"); R. at 332-39 (Denial Letter).

26.  Dr. Goubert's report addressed specific job duties which Plaintiff was unable to perform from May 2004 through May 2006 and the specific medical reasons underlying the disability. See R. at 321-23 (Letter of August 13, 2007), detailed *infra* text at n. 60.  Dr. Goubert also emphatically reiterated his conclusions that the "*most important reason* [Dr. Goubert] recommended" that Plaintiff cease work in November 2003 was that she "*could not have been expected to cope with the significant pressures of her job*", such pressures were "*exacerbating her condition*, and [Dr. Goubert] was persuaded that *continuing in this kind of environment would lead to even greater consequences and put her emotional well-being permanently at risk*." He concluded that Plaintiff "either had to give up her job and income or face potentially life-threatening consequences."  R. at 322 (emphasis added).

Similarly, Dr. Franzen's supplemental correspondence of August 15, 2007 indicated that Plaintiff would be unable to perform "each and every one of the job duties" described by MetLife, particularly (1) "directing and overseeing resources and activities to monitor an effective wealth management practice that meets business goals and (2) "planning and managing resources" because of both (a) her level of depression and (b) her related performance on the cognitive testing (*i.e.*, average not the "superior" level "required to successfully complete the job duties described").  R. at 302, 309.

27.  Plaintiff's Affidavit provided additional detail on specific job duties and her inability to perform some of them.  See R. at 303-05  (describing inability to remember what to say during client meetings, inability to attend social events/network with clients owing to feeling overwhelmed/depressed, forgetting about the deadlines to exercise a client's $300,000 option, losing track of client instructions, falling asleep at her desk, breaking into tears during a meeting with a CEO/client regarding the company's $200M 401(k) account, and missing a client meeting with a government executive regarding a municipal bond issuance).

major depression" and diagnosed her with severe adjustment disorder with anxiety and depression (as had Drs. Goubert and Franzen).[28] His report of October 17, 2007 specified job duties he concluded she was unable to perform.[29]

MetLife referred the file to another paper review, this by Dr. Reginald Givens, a psychiatrist and neurologist. In his report of November 7, 2007, Dr. Givens wrote (in language reminiscent of Dr. Schroeder's) that

> there is insufficient objective evidence of cognitive dysfunction that would prevent [Plaintiff] from performing occupational duties. There is no suicidal or homicidal intent, delusional thoughts, or hallucinations. The records do not show that [Plaintiff] has required inpatient or partial hospitalization during the review period in question. There is insufficient objective evidence to support significant impairment in activities of daily living as a result of a psychiatric disorder. Information in the records does not show that [Plaintiff] has been homebound as a result of a psychiatric condition.[30]

And he concluded that in light of the absence of such objective evidence and severe symptoms, and given the average range of scores reported in Dr. Franzen's evaluation (as to which he agreed with and "deferred to" Dr. Shallcross' report), there was "insufficient objective evidence of cognitive dysfunction that would prevent [Plaintiff] from performing occupational duties". R. at

---

28. See R. at 267-69.

29. Id. at 269 (specifying: analyzing and determining client needs, financial resources and objectives; advising clients on financial strategies and financial products; providing advice and guidance to clients on investment and related planning strategies; business development activities including the development and implementation of sales and marketing plans, prospecting, effective use of consultative sales and presentation skills and client tracking; or planning and management of resources (time, people, budget) to run a productive practice day-to-day and longer-term).

30. MetLife's Concise Statement at ¶ 47; R. at 254-257. Cf. supra n. 17 (citing similar language of Dr. Schroeder's Report and noting Court's previous caution to MetLife that administrator could not reasonably rely on consultant's opinion premised (expressly or effectively) on an incorrect standard).

254-57.[31] Dr. Goubert objected to various aspects of Dr. Givens' Report by correspondence of November, 2007,[32] and it was supplemented by addendums in December and January.[33]   By letter of January 18, 2008, MetLife reconfirmed its benefit denial, stating that the "medical information [did] not support functional limitations that would preclude [Plaintiff] from performing her own occupation as a financial consultant."[34]

### 4. Re-Opening of the Case and Current Proceedings

This case was  re-opened in January, 2008 and Plaintiff's Amended Complaint was filed on March 3, 2008.  Currently pending before the Court are cross-motions for summary judgment.

---

31. The Court notes that Dr. Givens' Report list of "Records Provided for Review" makes no mention of any job descriptions or Affidavits, but does include MetLife's claim log and the medical records.  The Report also notes that the questions addressed to Dr. Givens by MetLife did not request his opinion regarding disability particular to Plaintiff's job, under the language of the Plan, but rather, *e.g.*, whether the medical information supported "any reduction in the ability to work full time" or other "functional limitations". Not surprisingly, Dr. Givens responded in the generic that there was "insufficient objective evidence" of dysfunction that would prevent Plaintiff "from performing occupational duties".  See R. at 254-57.

32. See R. at 247-250 (noting that Dr. Goubert's conclusion that Plaintiff was "severely limited in her ability to function at work" was based on her behavior, history, symptoms, and testing"); id. (pointedly noting that suicidal intent, delusion, hospitalization and the like are unnecessary to the existence of the condition diagnosed); id. (reiterating specific impairment in daily activities, such as sleeping, social functioning, and leisure activities).

33. See R. at 243-44, 225-26.

34. See R. at 216-19.  This denial letter explicitly relies on the opinions of Drs. Shallcross and Givens in support of its determination that Plaintiff did not meet the long-term disability standard of the Plan.  See R. at 217.  Cf. Met Life's Brief in Support of Motion for Summary Judgment at 3 (noting that bases for denial included lack of objective findings and the opinions of the Administrator's "four (4) independent physician consultants").

## B. **Motion for Summary Judgment Standard**

Under Rule 56(c) of the Federal Rules of Civil Procedure, a court should grant summary judgment when "there is no genuine issue as to any material fact and [ ] the moving party is entitled to judgment as a matter of law." Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986); see also Eichenlaub v. Township of Indiana, 385 F.3d 274, 279 (3d Cir. 2004). In considering a motion for summary judgment, the Court views all evidence in the light most favorable to the party opposing summary judgment. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 465 U.S. 574, 587 (1986). The party opposing summary judgment must support each essential element of that opposition with evidence of record. Celotex, 477 U.S. at 322-34. On cross motions for summary judgment, the same standards and burdens apply. See Applemans v. City of Phila., 826 F.2d 214, 216 (3d Cir. 1987).

## C. **Standard of Review of Administrator's Determination Under ERISA**

As discussed in the Prior R&R, when a Plan vests the claims administrator with discretion, its interpretations of plan language and benefit determinations are generally subject to an "abuse of discretion" or "arbitrary and capricious" standard of review. See Firestone Tire & Rubber Co. v. Bruch, 489 U.S. 101, 115 (1989).[35] Both of these phrases are understood to

---

35. See also Michaels v. Equitable Life Assurance Soc., 2009 WL 19344, *4 (3d Cir. Jan. 5, 2009) (noting that plan which gives administrator discretion is reviewed "under an arbitrary and capricious standard" and citing to Firestone, 489 U.S. at 115, that review is "for an abuse of discretion").

16

require a reviewing Court to affirm the Administrator unless an underlying interpretation or

benefit determination was unreasonable,[36] irrational, or contrary to the language of the plan.[37]

      Moreover, when the case was first before this Court, review of the benefits determination

under an abuse of discretion standard, or some modified standard of lesser deference, was

governed by Pinto v. Reliance Standard Life Ins. Co., 214 F.3d 377 (3d Cir. 2000), which

established a "sliding scale" of deferential review turning on evidence of structural conflicts of

interest and/or procedural anomalies.[38]

     This past summer, however, the Supreme Court provided further guidance on judicial

review of an Administrator's decision under an abuse of discretion standard. In Metropolitan

Life Ins. Co. v. Glenn, 128 S.Ct. 2343, 2350 (2008) the Court directed, with express reference to

the Restatement (Second) of Trusts § 187, that a conflict of interest should simply constitute one

of several factors in evaluating whether the administrator has procedurally or substantively

abused its discretion in the decision-making process, but that it should not trigger a change in the

---

36. Michaels, 2009 WL 19344 at *4 ("To determine if a decision is arbitrary and capricious, this Court must consider whether the administrator had a reasonable basis for its decision").

37. Cf. Elms v. Prudential Insur. Co. of America, 208 WL 4444269, *8 (E.D. Pa. Oct. 2, 2008) (noting that under arbitrary and capricious standard, which is "essentially the same as an 'abuse of discretion' standard", the Court may overturn a decision if it is "without reason, unsupported by substantial evidence or erroneous as a matter of law") (quoting Abnathya v. Hoffmann-La Roche, Inc., 2 F.3d 40, 45 (3d Cir. 1993)).

38. Under Pinto, the factors considered in setting the sliding scale include (1) sophistication of the parties, (2) information accessible to the parties; (3) exact financial arrangements between the insurer and the company; and (4) status of the administrator. The Court also looks to procedural abnormalities, biases or unfairness in determining the level of scrutiny applied to an administrator's decision. See 214 F.3d at 392. The "procedural inquiry focuses on how the administrator treated the particular claimant." Post, 501 F.3d at 162; Tylwalk v. Prudential Ins. Co., 2007 WL 4335671 (3d Cir. Dec. 11, 2007).

standard of review. It further noted that both trust law and administrative law (on which judicial review of these ERISA decisions are based) require judges, in reviewing the lawfulness of benefit denials, to "tak[e] account of several different, often case-specific, factors, reaching a result by weighing all together." See id. at *2351 (citing Restatement §187).[39]

The factors referenced by the Supreme Court in affirming the Sixth Circuit's reversal of the District Court's grant of summary judgment for MetLife included: MetLife's (a) emphasizing a treating physician's report favoring denial while deemphasizing those contrary, "more detailed treating physician's reports"; (2) failure to provide its experts with all relevant evidence; and (3) failure to take into account the effects of stress on the claimant's medical condition. See 128 S.Ct. at 2352; see also id. (noting that these and other "serious concerns" appropriately weighed in the Circuit Court's setting aside of MetLife's discretionary denial of benefits).

At bottom, and as noted *supra*, the question before this Court is whether the Administrator's decision was reasonable. See Glenn, 128 S.Ct. at *2360 (Scalia, J., dissenting) (noting that "unreasonableness *alone* suffices to establish an abuse of discretion") (emphasis in original); id. at *2356 (Roberts, C.J., concurring) (concluding that conflict of interest was irrelevant and unnecessary to Sixth Circuit's reversal where MetLife's decision "was not the

---

39.   The Restatement (Second) of Trusts § 187 (applicable to judicial review of ERISA benefit denials) employs "abuse of discretion" to mean any of four distinct failures: the trustee acted dishonestly, with some other improper motive, failed to use judgment, or "acted beyond the bounds of a reasonable judgment". See Restatement, comment *e.* Under comment *h*, the last abuse occurs when the decision "is substantively unreasonable either with regard to [] exercise of a discretionary power or with regard to [] assessment of whether the preconditions to that exercise have been met." Id.

product of a principled and deliberative reasoning process") (quoting 461 F.3d 660, 674).[40]  The

Court is mindful that the question before it is whether Plaintiff presented sufficient evidence of

her disability to MetLife such that its denial of benefits was unreasonable.[41]  The burden is on

Plaintiff to demonstrate that MetLife's denial of benefits was arbitrary and capricious.  See

Moskalski v. Bayer Corp., 2008 WL 2096892, *4 (W.D. Pa. May 16, 2008).


**D.  Analysis**

In reviewing the administrator's conduct during the decision-making process and

evaluating whether it reached a reasonable decision, the Court has carefully considered the

following:

1. Inappropriately Selective Consideration of Evidence

The Court finds MetLife's selective consideration of the available evidence, including

reliance upon the solely paper-review reports of its experts while giving scant weight to the

contrary, more detailed, and consistent reports of claimant's three treating/evaluating physicians,

---

40. See also Glenn v. MetLife, 461 F.3d 660, 674 (6th Cir. 2006) (reversing and remanding judgment for administrator where MetLife did not engage in a "deliberate, principled reasoning process" or reach a result "supported by substantial evidence"); id. (explaining that an arbitrary and capricious assessment inherently requires the Court to review "the quality and quantity of the medical evidence and the opinions on both sides of the issues.  Otherwise, courts would be rendered to nothing more than rubber stamps . . . .").

41. See Elms v. Prudential Insur. Co. of America, 2008 WL 4444269 (E.D. Pa.  Oct. 2, 2008); MetLife's Answer with Affirmative Defenses at 7-8 (asserting that Plaintiff "failed to demonstrate her eligibility" for benefits under the Plan and "failed to satisfy all conditions precedent to any claim for benefits").  Cf. generally Blakely v. WSMW Indus., 2004 WL 1739717 (D. Del. July 20, 2004) (citing Lasser, 344 F.3d at 391) (noting that insurer's objections to claimant's *prima facie* showing of disability must be reasonably supported).

troubling;[42] particularly as it had discretion to supplement the medical evidence with an independent medical evaluation ("IME") but elected to forego other personal evaluation of Plaintiff's mental health.

Administrators of ERISA plans need not afford special deference to the claimant's treating physician, and are under no "discrete burden of explanation when they credit reliable evidence that conflicts with a treating physician's evaluation". Black & Decker Diability Plan v. Nord, 538 U.S. 822, 834 (2003) (cited in Michaels v. Equitable Life Assur. Soc., 2009 WL 19344 (3d Cir. Jan. 5, 2009)). By the same token, however, administrators may *not* "arbitrarily refuse to credit a claimant's reliable evidence, including the opinions of treating physicians." Id.; Michaels, 2009 WL 19344 at *9; id. at **8-9 (noting that administrator gave determining weight to conclusions of non-examining experts over those of claimant's treating physicians, and questioning the "discredit[ing] of substantial evidence" in setting aside District Court's affirmance of the benefit denial); Moskalski, 2008 WL 2096892, *9 ("As a corollary principle, the selective, self-serving use of medical information is evidence of arbitrary and capricious conduct."). In addition, a decision to forego an IME and conduct only a paper review, while not rendering a denial of benefits arbitrary *per se*, is another factor to consider in the Court's overall assessment of the reasonableness of the administrator's decision-making process. Glenn v. MetLife, 461 F.3d 660, 671 (6th Cir. 2006).[43]

---

42. Cf. generally Post, 501 F.3d at 164-65 (listing "self-serving selectivity in the use and interpretation of physicians' reports" as one of four examples of a procedural irregularity raising suspicion).

43. See also Post v. Hartford Ins. Co., 501 F.3d 154, 166 & n. 7 (3d Cir. 2007) (noting, in discussing insurer's heavy reliance on paper-review report that although ERISA does not require

(continued...)

The Courts have frequently expressed concern where, as here, the administrator denies a claim with reliance on the reports of paper-review consultants, in opposition to the treating and examining physicians' consistent and concurring opinions that the claimant is disabled. See, e.g., Elms v. Prudential Insur. Co. of America, 2008 WL 4444269, *15, *18 (E.D. Pa. Oct. 2, 2008) (noting administrator's selective use/interpretation of reports as a "procedural irregularity" under Post, and observing that "[it was] important to note that no doctor who ha[d] actually treated [plaintiff] or examined her in person, as opposed to performing a 'file review', ha[d] found her to be capable . . . of performing her work-related tasks"); Winkler v. Met. Life Ins. Co., 2006 WL 509387 (2d Cir. Mar. 1, 2006) (vacating decision as arbitrary where it was based "entirely on the opinions of three independent consultants who never personally examined [plaintiff], while discounting the opinions" of the treating and examining physicians who assessed psychiatric disability, including evidence of decompensation and depression).[44]

43. (...continued)
that special weight be given to opinions of treating physicians, "the courts must still consider the circumstances that surround an administrator ordering a paper review"); id. (noting that "at the time, the overwhelming weight of evidence" - including "regular reports indicating disability from her treating physicians " - argued in plaintiff's favor); cf. Elliott, 473 F.3d at 621 (explaining that although plan with authority to order additional medical tests was not required to do so, administrator's decision to conduct file-only review, "especially where the right to [conduct a physical examination] is specifically reserved" may raise questions about the thoroughness and accuracy of the benefit determination).

44. See also, e.g., Glenn, 461 F.3d at 671 (discussing MetLife's disregard of the opinion of the "only physician to have personally treated and observed" Plaintiff over the course of her disability dispute); id. at 669-70 (finding highly "perplexing" MetLife's "persistent failure to give any weight to" the treating physician's opinion letters "unequivocally" stating that claimant was unable to return to work); Kinser v. Plans Administration Committee of Citigroup, Inc., 488 F.Supp.2d 1369, 1382-83 (M.D. Ga. 2007) (concluding MetLife unreasonably "essentially ignore[d treating physician]'s clearly stated and supported opinion" and relied on "a cold record file review by a non-examining" consultant).

Courts have noted the particular appropriateness and helpfulness of an IME where the disability claim encompasses significant inherently subjective complaints. See, *e.g.*, Klinger v. Verizon Communications, Inc., 2007 WL 853833, *3 (E.D. Pa. Mar. 14, 2007) (noting that administrator in subjective-symptom disability case who conducts an IME "avoid[s having to make] the uncomfortable argument . . . that [it] reasonably gave greater weight to the opinions of physicians who have not physically examined the plaintiff than to those . . . who did"); Smith v. Bayer Corp. Long Term Disability Plan, 275 Fed.Appx. 495, 508 (6th Cir. 2008) (finding that administrator "arbitrarily and capriciously rejected" plaintiff's "reliable evidence" and "breached its fiduciary duty" to ensure "that reliance on its experts' advice was reasonably justified" where none of its several consultants personally evaluated plaintiff alleging mental health disability);[45] Adams v. Metropolitan Life Ins. Co., 549 F.Supp.2d 775 (M.D. La. 2007) (explaining that where "case involves subjective accounts . . . the fact that only a file review was conducted is relevant") (citing Calvert , 409 F.3d at 294 (taking into account that physician who concluded claims of subjective pain were not credible had never met or examined plaintiff)); Smith v. Continental

---

45. See also id. (noting that the plan reserved the right to order an IME and administrator's failure "to take advantage of that option, especially when faced with a [mental health] claim, [was] both puzzling and troubling"); id. ("Courts discount the opinions of psychiatrists who have never seen the patient for obvious reasons. Unlike cardiologists or orthopedics, who can formulate medical opinions based upon objective findings derived from objective clinical tests, the psychiatrist typically treats his patient's subjective symptoms . . . . [W]hen a psychiatrist evaluates a patient's mental condition, 'a lot of this depends on interviewing the patient and spending time with the patient' . . . a methodology essential to understanding and treating the . . . subjective symptoms the patient describes.") (quoting Sheehan v. Met. Life Ins. Co., 368 F.Supp.2d 228, 254-55 (S.D.N.Y. 2005)). In Sheehan, the Court concluded that where MetLife's determination of the claimant's psychiatric condition was limited to obtaining a paper-review opinion from Dr. Givens, it was procedurally flawed. 368 F.Supp.2d at 255.

Cas. Co.,450 F.3d 253, 263 (6th Cir. 2006) (holding that where credibility determination was key component of assessing disability, reliance solely on file review was arbitrary and capricious).

In addition, and as discussed *infra*, the Administrator gave extremely short-shrift to the job-specific disability determinations consistently reached by each of the three physicians to personally treat or examine Plaintiff. By omitting discussion of either (a) job-performance-specific disabilities identified by all three concurring examining physicians; and/or (b) all aspects of Plaintiff's underlying mental health diagnosis (*e.g.*, cognitive and emotional impairments, and restriction from the inherently stressful work environment of her occupation),[46] MetLife appears to have failed to seriously consider these physician's conclusions. See McGuigan v. Reliance Std. Life Ins. Co., 2004 WL 2228381, *6 (E.D. Pa. Oct. 6, 2003) (discussing same as evidence of biased review process); Elliott, 473 F.3d 613 (finding denial arbitrary because administrator failed to apply medical evidence to correct occupational standard and gave greater weight to non-treating physician's opinion for no apparent reason and without evidence of "a process that reason[ed] from the patient's condition to her work ability"). This was inconsistent with its duty to both identify its specific objections to and disagreements with the claimant's medical evidence, and to base those specific objections/disagreements on reasonable/rational grounds. Cf. Skretvedt v. E.I. DuPont de Nemours and Co., 268 F.3d 167 (3d Cir. 2001) (where all medical evidence supported disability, and administrator was unable to point to any "truly conflicting medical evidence", denial was "without reason" and "unsupported by substantial evidence"); Rudzinski v. Met. Life Ins. Co., 2007 WL 2746630, *13-15 (N.D. Ill. Sept. 14, 2007) (finding

---

46. Cf. Plaintiff's BSMJ at 17 (noting that Plaintiff's position had enormous pressures and enormous financial consequences); discussions of Plaintiff's actual job responsibilities, *supra*.

denial arbitrary and noting that (1) paper consultant improperly relied upon absence of objective validation, "selectively" cited to testing neuropsychologist's results/conclusions, and "glossed over" treating physician's findings; and (2) MetLife inappropriately relied on flawed consultant's opinion and rejected "numerous competent records" and "multiple written opinions" from "physicians who actually examined plaintiff"); Mishler, 2007 WL 518875, *9 (noting that although administrator may credit "contrary evidence from a non-treating physician", where such physicians, rather than relying on contrary evidence "cite to the absence of information", their views "do not serve to rebut . . . treating physician's opinion" and defendant "has not offered a reasoned explanation for its decision").[47]

### 2. Rejection of Subjective/Self-Reported Evidence Without Reasonable Basis

The Court is also highly concerned by the Administrator's rejection of evidence self-reported by Plaintiff to her treating/evaluating physicians where (a) MetLife had no basis for rejecting those observing-physicians' conclusions that Plaintiff's evidence was credible and (b)

---

[47]. The Court also notes that the Record reflects an at times troublingly inexact/careless review and/or interpretation of Plaintiff's medical records. Compare, e.g. R. at 61 (May 2004 Report of Dr. Franzen, noting, in describing Plaintiff's feelings of depression, distress and anxiety, her report that "she has not been able to read *a book* in two years and she had been a voracious reader")(emphasis added) with R. at 94 (September 13, 2004 Report of Dr. Schroder relying on Dr. Shallcross' conclusion that Dr. Franzen's neurocognitive conclusions were not "borne out" by the test data and noting, as a "particular" example, that the "employee's report of not being able to read for two years" . . . was not supported by the test results), R. at 8 (noting that consultant rejected plaintiff's report that she had not "been able to read in [two years]" because there was "no objective documentation of a reading impairment of this magnitude"). MetLife's Final Denial letter of January 18, 2008 expressly relies on this mistaken critique of Dr. Franzen's evaluation. See R. at 217 ("Dr. Givens agreed with the interpretation of Dr. Franzen's report that was previously provided to MetLife by Dr. John Shallcross . . . [who] concluded that nothing in Dr. Franzen's results supported your client's claim to be unable to read for two years . . . ."). Cf. McGuigan, 2003 WL 22283831, *7 (discussing evidence of "inattentive process" as raising suspicions of biased review).

the Plan did not impose an evidentiary standard that excluded, *e.g.*, the treating psychiatrist's office notes of observations and self-reported symptoms and events. See, *e.g.*, Adams v. Metropolitan Life Ins. Co., 549 F.Supp.2d 775 (M.D. La. 2007) (finding for plaintiff where MetLife's benefit denial relied on multiple paper-review consultants who disregarded "subjective" and "self-reported" evidence, and rejected conclusions of treating/evaluating physicians).

As discussed, *supra*, the consultants on which MetLife expressly relies, in determining that Plaintiff failed to adequately support her claim, repeatedly dismissed Plaintiff's subjective and/or self-reported evidence. See R. at 217-19 (MetLife's Final Denial Letter of January 18, 2008, repeatedly noting insufficiency of "objective evidence" of impairment); id. at 218 (noting Dr. Given's rejection of Dr. Goubert's "opinion that [Plaintiff] could not function socially and could not sleep regularly, had bouts of crying and could not engage in activities that she spent significant time on" as not supported by "sufficient objective evidence"); id. at 243 (Dr. Givens' December 7, 2007 Report rejecting conclusions of Dr. Merikangas' personal evaluation of Plaintiff as reporting "subjective complaints" of mental health symptoms without providing sufficient "objective evidence").[48]

_____

48. See also, *e.g.*, MetLife's Concise Statement at ¶ 18 (noting Dr. Schroeder's dismissal of Dr. Goubert's Beck Depression Inventory of November, 2003 and Plaintiff's Health Questionnaires of early and late February, 2004, as "transparent instruments of self-report"); id. at ¶ 22 (noting Dr. Schroeder's dismissal of Dr. Goubert's notes of Plaintiff's difficulty concentrating because the treating physician failed to perform a detailed cognitive mental status examination or otherwise "substantiate" Plaintiff's self-reporting); id. at ¶ 36, R. at 347 (noting, as part of Dr. Murphy's response to letters of disagreement from Plaintiff's physicians, that neither the "subjective cognitive complaints" documented by Dr. Goubert nor plaintiff's "feeling stressed and having difficulty sleeping" were supported by objective findings/data and therefore did not affect consultant's conclusions); id. at ¶¶ 47-51 (citing to Dr. Givens' repeated references to

(continued...)

And as noted *supra* page 2, the Plan's standard of eligibility for long-term disability benefits is "if you are unable to perform all of the regular duties of the Merrill Lynch job you had before your disability began and are under the continuous care of a doctor treating you within the scope of his or her specialty." <u>See</u> R. at 131 (Plan document). The Plan further advises the employee that to submit a claim the employee and her doctor need to complete the application, and "additionally" the employee "may be required to take a medical exam administered by a doctor chosen by the claims administrator to determine" eligibility.

Many courts have noted the general inappropriateness of an insurer's dismissal of the claimant's self-reported/subjective evidence. <u>See</u> <u>Adams</u>, 549 F.Supp.2d at 793 ("A plethora of cases have held that subjective evidence cannot be discounted solely because it is subjective. Accordingly, MetLife's wholesale ignorance of the plaintiff's subjective complaints was in error."); <u>Kinser</u>, 488 F.Supp.2d at 1381 (finding termination of benefits for lack of "objective medical evidence or formal mental status examination" arbitrary and capricious where treating psychiatrist's evaluations were clear, psychiatric conditions are "not easily proven by purely 'objective' measures", medical records did reveal "objective" clinical observations of treating psychiatrist, and MetLife could have required personal evaluation but did not).[49]

---

48. (...continued)
"insufficient objective evidence" and rejection of Plaintiff's treating and examining physicians' affirmances of disability as reporting "complaints from plaintiff" without objective evidence).

49.   <u>See also</u>, *e.g.*, <u>Elms v. Prudential Insur. Co. of America</u>, 2008 WL 4444269, *15 n. 21 (E.D. Pa. Oct. 2, 2008) (granting summary judgment for claimant where defendant completely discounted "as subjective and not supportive" claimant's complaints, documented by treating physician, whose opinion did not change over four year period; and cautioning that "[p]lan administrators must be wary of denying claims because of a lack of objective evidence when the disabling condition . . . rests heavily on subjective evidence"); <u>Michaels</u>, 2009 WL 19344 at *9

(continued...)

They have also held it unreasonable to reject Plaintiff's self-reported evidence where, as here, the Administrator has no basis for believing it to be unreliable. See, *e.g.*, Adams, 549 F.Supp.2d at 792 (noting plaintiff's assertion that MetLife "improperly 'rejected [her] complaints of pain and her description of her limitations even though [. . .] no one ha[d] questioned her [credibility] or pointed out any inconsistencies between her reports and the objective findings'"); id. at 794 (holding that although "the defendant was free to discredit the plaintiff's subjective complaints", where "the defendant offers no basis to challenge the plaintiff's subjective accounts . . . or the medical opinions that have documented" them, it cannot "resort[] to the [other] tactic [of] discounting the plaintiff's accounts . . . altogether."); Ondersma v. Met. Life Ins. Co., 2007 WL 4371422, *5 (N.D. Cal. Dec. 12, 2007) (noting, in discussion plaintiff's *prima facie* case, that to extent treating physician's opinions were based on symptoms not personally observed, there was no basis to disregard such opinions because there was no basis to find plaintiff not credible).

Similarly, they have held it unreasonable to reject Plaintiff's treating/examining physician's notes of Plaintiff's self-reporting and subjective observations, or other assertedly "subjective" evidence, where, as here, where the applicable Plan does not restrict the type of evidence that may be used to demonstrate disability. See, *e.g.*, Glenn v. MetLife, 461 F.3d 660 (6th Cir. 2006) (concluding that rejection of treating physician's assessment of role of work-

49. (...continued)
(quoting MetLife consultant's rejection of treating physician's assessments because they lacked "objective clinical evidence" and incorporated claimant's "subjective" accounts; and observing that "reliable evidence" may not be "arbitrarily refuse[d]"); Evans v. Unumprovident Corp., 434 F.3d 866 (6th Cir. 2006) (finding insurer's denial arbitrary where it "relied heavily on independent physician's review" disregarding - as "self-reported and uncorroborated" - treating physicians' conclusions regarding work-related stress).

related stress in Plaintiff's condition was unreasonable where Plan provided only that Plaintiff

"must be under the regular care of a qualified physician under a course of treatment appropriate

for the disability" and must support claim with "current medical documentation"); id. at 673

(noting that Plan did "not say that self-reported or 'subjective' factors should be accorded less

significance than other indicators"); Cohen v. Standard Ins. Co., 155 F.Supp.2d 346, 354 (E.D.

Pa. 2001) (noting that insurer improperly rested denial on absence of "objective medical

evidence" regarding risk to plaintiff from work stress where plan had no such requirement)

(citing Mitchell); Adams, 549 F.Supp.2d at 793 (where MetLife pointed to no plan provision

"limiting the record . . . to objective data", subjective accounts and assessments by her doctors

should have been considered).[50]

      See also discussion *infra* Section D (5).[51]

    3. Failure to Provide All Relevant Evidence to Consultants

---

50. Cf. R. at 247 (November 21, 2007 Letter of Dr. Goubert, noting that "by any reasonable medical standard" Plaintiff's "clinical treatments and observations" were "objective and more than sufficient to support a finding of functional limitations"); R. at 268 (Report of Dr. Merikangas, noting that Plaintiff's self-reporting and affidavits were consistent with objective medical findings of three physicians to examine her). R. at 62 (May 2004 Report of Dr. Franzen including Plaintiff's self-reporting of specific examples of prior superior cognitive performance and current specific examples of impairment); id. (specifying the testing and regression formula bases for his prediction of Plaintiff's "premorbid intellectual functioning" as high-average to above-average); May v. Met. Life Ins. Co., 2004 WL 2011460, *8 (N.D. Cal. 2004) (abuse of discretion to deny subjective disability claim for lack of credible evidence where record was "replete" with evidence, "including [plaintiff's] own reports" and "agreement of her physicians that the symptoms [she] describe[d were] consistent with those caused by her medical conditions"); Cohen, 155 F.Supp.2d at 354 (including "opinions of treating physicians" in "objective evidence" submitted by claimant and improperly rejected by defendant).

51. Cf. Boston v. Lockheed, 110 F.3d 1461, 1463 (9th Cir. 1997) (noting that under 29 CFR § 2560.503 "[i]t is insufficient to simply inform a claimant that there is no 'objective' evidence to support [her] claim without specifying what type of 'objective' evidence would substantiate it").

The next area of concern is the Administrator's failure to provide the consultants relied upon with all relevant evidence, *i.e.*, an accurate and complete profile of the scope and requirements of the job Plaintiff was actually performing, (including, *e.g.*, performance parameters and conditions reasonably related to the disability alleged), despite this Court's guidance to the contrary. As noted above, the disability standard of the Plan language at issue, as interpreted by the Administrator, is whether the employee was "unable to perform" any one of the regular duties of the "Merrill Lynch job [s/he] had before [the] disability began".[52]

Although on remand MetLife has expanded its characterization of Plaintiff's position from a "sedentary position"[53] to the general job description for a "financial consultant" with Merrill Lynch, and outlined further job duties in its June 8, 2007 Denial Letter, the Administrative Record reflects reliance on consultant's opinions predicated on (a) at worst, no and (b) at best, incomplete occupational information. See discussions of consultant's reports, *supra*. In addition, Plaintiff presented significant evidence that *her* job (*i.e.*, the "job she had" in the language of the Plan) at the time of the onset of her disability encompassed relevant duty/performance requirements not fully reflected in the general job description(s). See, *e.g.*, R.

---

52. The R&R reminded MetLife that the Plan unambiguously required a fair assessment of Plaintiff's abilities as they pertained to the scope and nature of her particular position, and that the present record did not reflect a position-specific assessment. See R&R at 16; id. at 18 ("ERISA case law is replete with considerations of the reasonableness of benefit denials turning on an administrator's determination of, *e.g.*, the relevancy/materiality of specific, individual, regular job duties; each of those cases suggests a record far more developed than the one presently before this Court.").

53. Cf. R. at 371 (Dr. Murphy's Report, noting that claim was originally denied when "it was concluded that the information did not support impairment from a sedentary job").

at 303-05 (Plaintiff's August 17, 2007 Affidavit).[54]   In electing to again disregard, rather than meaningfully communicate/assess the scope and nature of the actual job duties Plaintiff was performing/meeting for Merrill Lynch, MetLife did not adhere to the fiduciary guidelines applicable to its ERISA benefit decision.[55]

---

54. See also id. at 303 (stating that the 'regular job duties' described by MetLife were "generic descriptions of what [Plaintiff] was required to do to be successful, and [did] not describe in detail the nature of [her] actual job duties as of the time [she] was unable to continue working in November 2003"); 303-05 (detailing that (1) Plaintiff's more than 400 accounts included entity with $200M in 401(k), which required visiting each of 11 plants nationwide 4 times for year (*i.e.*, 44 trips for this one client), and CEO with $125M in individual assets; (2) Plaintiff supervised staff of four; (3) client maintenance and "prospecting" duties required Plaintiff to attend political and charitable events, and entertain at least three days per week).

55. See  Plaintiff's BSMSJ at 18 (asserting that failure of Administrator's consultative reports to reflect meaningful consideration of actual job duties goes directly to the question of reasonableness).  Compare generally Plaintiff's three personally-examining physician reports and correspondence (with their application of diagnoses to specific job duties being performed) with Defendant's four paper (or partial paper) review consultants (with their general failure to discuss relevant occupational requirements).

In particular:

(1) Dr. Schroeder's Reports of August and September 2004 do not include in their list of documents reviewed any job description information.  See R. at 94-96; 394-96.  Nor do they discuss Plaintiff's job duties.  See *supra* n. 17.
(2) Dr. Shallcross was asked to review no document other than Dr. Franzen's evaluation. See R. 408-11.
(3)  Dr. Murphy's Reports lists occupational information reviewed as "job description of financial consultant" but describes Plaintiff's job duties simply as (1) finding new clients, (2) assimilating/interpreting information to client needs, (3) maintaining positive relationships, and (4) planning sales strategies, preparing product recommendations and discussing financial plans  See R. at 371, 347, 372; *supra* n. 23.
(4)  Dr. Givens' Reports do not include in their list of documents reviewed any job description information.  And they conclude in quite generic terms that the objective evidence was insufficient to support "a global level of psychiatric impairment" or disability from "performing occupational duties" requiring an *unspecified degree* of " understanding and memory, concentration and persistence, social interaction and adaptation."  See R. at 254-57; *supra* n. 31.

(continued...)

_____ As noted *supra* n. 19, the Third Circuit has held that assessment of a claimant's inability to "perform the material duties of his/her regular occupation" requires consideration of the *"usual work that the insured is actually performing* immediately before the onset of disability." Lasser v. Reliance Standard Life Ins. Co., 344 F.3d 381, 387 (3d Cir. 2003) (emphasis added); id. (noting that "[b]oth the purpose of disability insurance and the modifier 'his/her' before 'regular occupation'" make that definition clear). See also Kalein v. Tenet Employee Benefit Plan, 2007

---

55. (...continued)

The Court further notes that the Administrative Record indicates that the "Financial Consultant" job description provided to Dr. Murphy for consultation in May, 2007 was apparently significantly less comprehensive than the outline of duties and responsibilities set forth in MetLife's Denial Letter of June, 2007. Compare R. at 392 (Job Description page in fax of Report from Dr. Murphy) with R. at 334-336 (Denial Letter, including such additional duties as, *e.g.*, "maintaining an acceptable level of revenue generation and assets under management to meet or exceed agreed upon goals", "formulating and conducting marketing strategies to develop and enhance client relationships", "profiling activities to determine a client's investor profile, financial resources, objectives, time horizon and preferences", "business development activities including the development and implementation of sales and marketing plans . . ., effective use of consultative sales and presentation skills and client tracking"; "prospecting activities . . . including . . . seminars, community, professional and social networking . . ."; and "continuing education and training (including internal qualifications, titles and external designations) on investment products, portfolio and planning strategies").

Recitation in a benefit denial letter of what should have been considered cannot, of course, stand in lieu of an administrative record reflecting actual consideration. Cf. Plaintiff's BSMSJ at 12 (asserting a "disconnect between the actual medical review and the conclusions reached by MetLife's Claims Administrators"); Elms v. Prudential Insur. Co., 2008 WL 4444269, *20 (E.D. Pa.. Oct. 2, 2008) (noting that although insurer "accurately refer[red]" to job requirements in its correspondence, there was no indication it "actually considered [the] requirements in light of [Plaintiff]'s limitations", nor did it "explain how it expected [Plaintiff] to cope with [those] obligations" given disability assessments of the physicians to examine her); Moskalski v. Bayer Corp., 2008 WL 2096892, *8 (W.D. Pa. May 16, 2008) (noting that consultant's report leapt "without an iota of evidence to bridge the gap, from fairly mundane observations about Plaintiff's intelligence, . . . daily pursuits . . . to his ability to work as a biochemist" and that defendant made the same unreasonable leap). Cf. generally Hackett v. Xerox Corp. Long-Term Disability Plan, 315 F.3d 771, 774 (7th Cir. 2003) (noting that the Courts will not uphold a fiduciary's finding "when there is an absence of reasoning in the record to support it").

WL 4142770, *5, n. 3 (E.D. Pa. Nov. 21, 2007) (explaining Lasser as requiring that regular

occupational duties be determined "from the perspective of the *employee*, [looking] at what work

he is 'actually performing' and 'in which he was actually engaged'") (quoting Lasser) (emphasis

added).

And our sister Court has recently held an Administrator's failure, under similar Plan

language, to duly consider evidence of Plaintiff's specific, actual job responsibilities/duties to be

an abuse of discretion.  See  Elms v. Prudential Insur. Co. of America, 2008 WL 4444269, *16

(E.D. Pa.  Oct. 2, 2008) (concluding, under Plan language providing benefits with disability from

material/substantial duties of "your occupation", that administrator's assertion that claimant was

capable of sedentary office-centric job was a "gross over-simplification" given the documentation

in the record of the scope of plaintiff's actual job performance); id. at *5 (noting that the

administrator "ignored [p]laintiff's contentions, supported by the record" that defendant's

characterization of her job - based on the written job description and telephone conversations

with her employer - was "inaccurate" and omitted additional job requirements from which she

was disabled, and that the administrator failed to "substantively address" those aspects of her

job).[56]

---

56.  See also Elliott v. Metropolitan Life Ins. Co., 473 F.3d 613, 619 (6th Cir. 2006) (finding
denial arbitrary where "[d]espite the numerous medical evaluations that took place in this case,
MetLife did not rely on an application of the relevant evidence to the occupational standard");
Lindquist v. Continental Casualty Co., 394 F.Supp.2d 1230, 1250-51 (C.D. Cal. 2005) (reversing
denial of benefits where administrator minimized job responsibilities and ignored evidence of
plaintiff's own job functions).  See generally Adams, 549 F.Supp.2d at 787 ("A decision is
arbitrary if it is made 'without a rational connection between the known facts and the decision or
between the found facts and the evidence.'") (quoting Bellaire Gen. Hosp. v. Blue Cross Blue
Shield of Michigan, 97 F.3d 822, 828 (5th Cir. 1996)).

In addition, the Court notes that Plaintiff's position as a financial consultant was, by her uncontroverted evidence, and even by the job descriptions provided by her employer, patently distinguishable from that of a comparatively uneducated, unskilled, low-wage employee (such as a grocery store clerk or fast-food worker). MetLife's reliance on consultant's evaluation language that appears to make minimal, if any, distinction suggests another way in which it fell short of a principled and deliberative reasoning process. Compare, *e.g.*, R. at 217-19 (MetLife's Denial Letter of January 18, 2008 citing to Dr. Givens's report and explaining, as basis for benefits denial, that Plaintiff retained the "functional abilities to engage in occupational duties requiring understanding and memory, concentration and persistence, social interaction and adaptation");[57] MetLife's Concise Statement at ¶ 52 (citing Dr. Given's observation, in concluding that Plaintiff failed to provide sufficient objective evidence of disability, that her IQ was in "average range and [Plaintiff's] job duties do not specify a specific [*sic*] IQ that will be required to perform her occupational duties"); R. at 219 (MetLife's Denial Letter of January 18, 2008 citing same) with R. at 321 (August 13, 2007 Letter of Dr. Goubert reiterating that his opinion, based on psychiatric treatment sessions with Plaintiff throughout the two-year disability period, was that she was "anxious, self-doubting, easily tearful, sleep deprived and forgetful" and "[unable] to maintain her composure in stressful situations or to carry out demanding cognitive functions", such that she could not fulfill her duties to "high net-worth clients, large unions, and city and municipal authorities", "resolve complex financial issues with consequences in the tens or hundreds of millions of dollars", or work the more than 60 hours per week necessary to succeed

---

57. This generic description of "occupational duties" is equally applicable *e.g.*, to an individual "working the floor" at Wal-Mart.

at her job);[58] R. at 248 (November 21, 2007 letter of Dr. Goubert in sharp disagreement with Dr. Givens:  "I find especially comical Dr. Givens' conclusion that because [Plaintiff] scored in the average IQ range (101) this somehow means she had no functional limitations at work.  Maybe if all she were required to do was to prepare and serve hamburgers at Wendy's this comment might mean something, but an average IQ of 101 is hardly what I would consider adequate to carry out [Plaintiff]'s duties.  My opinion is that her baseline IQ before the onset of symptoms in 2003 was almost certainly significantly higher than 101.  I cannot imagine how she could have built a portfolio in the hundred of millions of dollars, and managed assets for very sophisticated clients, with an average IQ.");  R. at 268 (Report of Dr. Merikangas, noting that "in particular a person with [Plaintiff]'s level of impairment could not have performed a the high level required by her employer . . . in managing a portfolio in the hundreds of millions of dollars, or in the business development activities required to generate new business or maintain her existing clients.  These job duties, much like the job duties of a surgeon or chief executive of a corporation, require the highest level of mental acuity, stamina and emotional stability. [Plaintiff] lacked these necessary qualities.  Given the very demanding nature of her job duties and the combined demands made by these duties it would not have taken much in the way of impairment for [Plaintiff] to be considered disabled under [the Plan].  [Plaintiff]'s level of impairment far exceeded the level of

_____

58.  Id. at 322-34 (further specifying several ways in which Plaintiff was unable to meet the regular job duties defined by MetLife, *e.g.*, that Plaintiff was not medically capable of managing significant client assets, effectively dealing with pressure, "making rational decisions under the time constraints required in her business", long hours, business development activities, or effective presentation of complex financial information).

impairment that would have prevented her from performing not merely one of her duties but many of her duties.).[59]

4. <u>Reliance on Expert Conclusions and/or Determination Premised on Incorrect Standard</u>

As discussed, *supra* at nn. 17-19, this Court previously directed MetLife's attention to language in the consultative reports of Drs. Schroeder and Shallcross which strongly suggested that their conclusions were reached with reference to a standard of disability constituting an unreasonable interpretation of the Plan language (*i.e.*, a "complete disability from any gainful employment" or "Social Security disability" standard) and/or one subsequently expressly refuted by Defendant (*i.e.*, a "disabled from each and every duty of own position" standard). <u>See</u> R&R at 4-5; 12 and n.15.

Yet the Administrator continues to expressly, inappropriately rely on these unamended reports, and subsequent reports containing similar language suggestive of an equally inappropriate standard.[60] <u>Cf.</u> <u>Sanderson v. Continental Casualty Corp.</u>, 2005 WL 2340741, *5

_____

59. <u>Cf.</u> <u>Lasser v. Reliance Standard Ins. Co.</u>, 344 F.3d 381 (3d Cir. 2003) (noting the stress inherent in the on-call and emergency service aspects of surgeon's regular occupation in context of administrator's failure to duly consider same); <u>Rosenthal v. The Long-Term Disability Plan of Epstein, Becker & Green, P.C.</u>, 1999 WL 1567863 (C.D. Cal. Dec. 21, 1999) (noting the particularly high levels of heavy stress and long hours of a trial attorney in concluding that administrator improperly denied benefits and failed to adequately consider requirements of claimant's position); <u>Michaels v. Equitable Life Assurance Soc.</u>, 2009 WL 19344, *2 (3d Cir. Jan. 5, 2009) (noting examining consultant's opinion that tax attorney suffering disability of major depression was "probably" capable of some work but "not able currently to do the kind of job he did before" and "certainly not able to command anywhere near his previous income").

60. <u>Compare, *e.g.*</u> R. at 217-19 (MetLife's Denial Letter of January 18, 2008 (citing to Dr. Givens's review and explaining, as basis for benefits denial, that Plaintiff retained the "functional abilities to engage in occupational duties requiring understanding and memory, concentration and persistence, social interaction and adaptation"); <u>id.</u> (citing as basis for benefits denial that records did "not show that [plaintiff] required inpatient or partial hospitalization", had "significant

(continued...)

(D.Del. Sept. 26, 2005) (noting administrator's continued reliance after remand on flawed

consultant's report, without seeking reassessment, and finding denial arbitrary and capricious);

Elliott, 473 F.3d 613, 616 (concluding MetLife's denial was arbitrary where it relied on paper-

review consultant who assessed disability under erroneous standard).[61]

5. Absence of Reasonable Basis for Rejection of /Failure to Address Treating/Evaluating

Physicians' Conclusions Regarding Work-Related Stress

Plaintiff's treating/evaluating physicians repeatedly opined that Plaintiff's mental health

disability rendered her unable to perform particularized aspects/components of the job she was

performing at the onset of her disability and unable to work under its inherently stressful

conditions. See supra. The first page of the Administrative Record, Plaintiff's Diary Review-

---

60. (...continued)
impairment in activities of daily living" or "was homebound" as a result of psychiatric disorder,
was "unable to read for two years" or unable "to recall events from day-to-day", had any "suicidal
or homicidal intent, delusional thoughts, or hallucinations") with R. at 247-50 (Letter of Dr.
Goubert roundly highlighting questionable aspects of Dr. Givens' report, including that (1) his
opinion as to ability to engage in "occupational duties requiring understanding . . ." is devoid of
particular levels of understanding . . . and without reference to specific job duties; and (2)
suicidal intention, delusion and the like are unnecessary to Plaintiff's diagnosis and the
observation that they were lacking is accordingly irrelevant); id. (generally noting absence of
meaningful evaluation under Plan standard); R. at 321-23 (Letter of Dr. Goubert explain with
specific reference to duties being performed, why Plaintiff was unable "to perform each and
every one of her job duties at the required level").

61. Cf. also Kinser, 488 F.Supp.2d at 1383 (noting, in finding MetLife's reliance on Dr.
Schroeder's paper-review, in opposition to treating psychiatrist's opinion, unreasonable, that the
credibility of Dr. Schroeder's opinion was "further clouded" by his lucrative career "conducting
one-hour file reviews for disability insurance companies" and MetLife's provision of an office
and standardized template for his reports, facts certainly known to administrator at the time of its
decision); Nord, supra (expressing concern regarding insurer's repeated hiring of same
physicians, creating own-economic-interest incentives); Bradford v. Met. Life. Ins. Co., 2006 WL
1006578, *4 (E.D. Tenn. Apr. 14, 2006) (noting that MetLife consultations had accounted for
40% of Dr. Shallcross' practice) (citing to Winkler v. Met. Life Insur. Co., 170 Fed. Appx. 167
(2d Cir. 2006)).

Report in this case, notes Dr. Goubert's conclusion that Plaintiff's condition "resulted from work related stress" and that she was "unable to [return] due to lack of ability to cope with stress." R. at 1. Her treating physician further concluded that Plaintiff "either had to give up her job and income or face potentially life-threatening consequences" because her job duties and their related pressures "as a whole were literally destroying [Plaintiff]'s mental health."[62]

"It is a basic tenet of insurance law that an insured is disabled when the activity in question would aggravate a serious condition affecting the insured's health." Lasser, 146 F.Supp.2d at 628. Yet MetLife concluded that Plaintiff's benefit claim failed for lack of "supportive documentation" and rejected related evidence as "subjective" rather than respond to the treating/evaluating physicians' conclusions regarding the impact of employment-related stress on claimant's medical condition.

This conclusion "unjustifiably implies" that Dr. Goubert's "observations and notations" regarding work-related stress did not constitute "supportive medical documentation." Glenn v. MetLife, 461 F.3d 660, 672-73 (6th Cir. 2006) (concluding that MetLife *arbitrarily* dismissed stress as an "unsupported" and "subjective factor", given treating physicians' unwavering opinion that job stress was significant factor to claimant's condition, *i.e.*, that claimant could not work in an environment that would cause any significant psychological stress or demands). In this case, as in Glenn, although it is "unclear from the record what sort of documentation MetLife would

_____

62. R. at 321-23 (August 13, 2007 Letter of treating physician, Dr. Goubert, emphatically reiterating that the "most important reason [Dr. Goubert] recommended" that Plaintiff cease work in November 2003 was that she "could not have been expected to cope with the significant pressures of her job", such pressures were "exacerbating her condition, and [Dr. Goubert] was persuaded that continuing in this kind of environment would lead to even greater consequences and put her emotional well-being permanently at risk"); R. at 44.

have found sufficient to establish the negative effect of stress on [claimant]'s medical condition, the *Plan itself* does not restrict the type of evidence that may be used to demonstrate . . . disability."  Glenn, 461 F.3d at 673 (noting that plan required only "current medical documentation" and that claimant "be under the regular care of a qualified physician . . .").

Plaintiff was employed in the very high-stakes, high-pressure, fast-paced, volatile, long-houred, and generally mentally- and emotionally-demanding career of a financial consultant in a major brokerage institution.[63]  Her treating/evaluating physicians assessed the stressful nature of that position, deemed it causal to her mental health symptoms and diagnoses, and concluded that (a) Plaintiff was unable to continue to perform under the conditions of that occupation and (b) to attempt to do so would risk serious further consequences to her health.[64]  The Administrator's failure to meaningfully address these considerations was arbitrary and capricious.  See Chapman, 2008 WL 141632 at 6 (granting plaintiff's motion for summary judgment under arbitrary and capricious standard where administrator failed to consider "all the essential duties" of claimant's

---

63.  Cf. Chapman v. Plan Admin. Committee of Citigroup, 2008 WL 141632 (W.D.N.Y. Jan. 14, 2008) (noting that financial consultant's job requirements included: entrepreneurial skills, ability to develop marketing plans and strategies to acquire clients, proficiency at analyzing clients' financial positions and implementing appropriate course of action, and ability to handle market volatility and maintain composure for themselves and their clients); detailss of Plaintiff's job requirements, *supra*.

64.  See similarly Chapman, 2008 WL 141632, *2 (citing treating physician's evidence that stressful nature of job was possible contributing factor to plaintiff's medical condition and that plaintiff was "totally restricted" from "stressful situations" owing to high degree of risk that it would induce further medical problems); id. at *3 (citing treating psychologist's concurring evidence that stress was contributing factor in mental health diagnosis, and return to "pressure-filled" work environment would place plaintiff at increased risk); id. at *4 (noting that defendant based its decision on paper-review opinions provided by Dr. Greenhood and Dr. Shallcross concluding that "psychiatric impairment would not be of a severity to preclude *all work capacity*") (emphasis added in Opinion).

occupation as financial consultant); id. (noting that consultant "offered no opinion" on treating physicians' uniform conclusion "that a return to a high-stress work environment would be harmful" and "failure to address that issue was arbitrary and capricious"); McGuigan, 2003 WL 22283831, *6-9 (concluding that "nature of the claim decision" was "arbitrary and capricious" and that defendant performed "self-serving, selective and incomplete review" of medical records where it ignored treating physician's conclusion regarding the risk occupational stress posed to plaintiff's health); Kalish v. Liberty Mutual Assurance Co. of Boston, 419 F.3d 501, 509 (6th Cir. 2005) (noting that commentary by reviewer contained little more than conclusory assertions and at no point explained *how* someone with plaintiff's condition could function on a daily basis in the "high-stress environment" of former position).[65]

### E. <u>Attorney's Fees and Costs</u>

An award of attorney's fees and costs in an ERISA action is discretionary. 29 U.S.C. § 1132(g)(1). In making the determination of whether a party is entitled to such fees, the Court considers the following factors: (1) the non-prevailing party's bad faith or culpability; (2) the ability of that party to satisfy an attorney's fee award; (3) the deterrent effect of such award on that party; (4) the benefit conferred on members of the plan as a whole; and (5) the relative merits of the parties' positions. Ursic v. Bethlehem Mines, 719 F.2d 670, 673 (3d Cir. 1983); Hahnemann Univ. Hosp. v. All Shore, Inc., 514 F.3d 300, 310 (3d Cir. 2008).

---

65. Cf. Glenn, 461 F.3d at 674 (concluding that "there was no adequate basis" for administrator's failure "to factor in one of the major considerations in [claimant's] pathology, that of the role that stress played in aggravating her condition").

In this case, the Court concludes that all but the fourth factor weigh in favor of an award of fees.  More particularly, this Court concludes that the arguments made by the parties in their briefings to the Court and the Administrative Record provide sufficient justification for an award as follows:

As noted above, MetLife's decision was arbitrary and capricious in light of clear ERISA case law.[66]  In addition, the Administrator elected to disregard this Court's specific pre-remand directions (*e.g.*, it failed to meaningfully assess Plaintiff's *prima facie* evidence of disability in the context of the demands of the job she was actually performing at the time).  The Administrative Record indicates that throughout its review of Plaintiff's claim, MetLife engaged in selective and self-serving examination/utilization of the available evidence.[67]  It is able to satisfy the award.   Finally, the Court reasonably expects that an award of fees in this case may have a deterrent effect on repeated abuse of discretion in ERISA disability benefit cases by this insurer.  It notes that, in addition to the hardships suffered by claimants wrongfully denied insurance compensation for lost wages,  patently unreasonable denials of insured disability benefits and the litigation thereof are, as in this case, a significant drain on limited judicial resources.   See Adams v. Metropolitan Life Ins. Co., 549 F.Supp.2d at 795 (noting, in awarding

---

66.  See Moskalski v. Bayer Corp., 2008 WL 3914273, *2 (W.D. Pa. Aug. 25, 2008) (noting that although "arbitrary and capricious denial of benefits does not necessarily equal culpability or bad faith", where defendant's denial, on more than one occasion, lacked supportive evidence and made selective use of evidence, "some level of culpability" was indicated and factor weighed in favor of fee award).

67.  See Rudzinski, 2007 WL 2746630, *20 (noting, in awarding fees, "MetLife's utter disregard for the evidence favoring Plaintiff's claim and its selective citation to the Record" as weighing heavily in favor of award of fees and costs) (citing Hess v. Hartford Life & Acc. Ins. Co., 274 F.3d 456, 464 (7th Cir. 2001)).

fees, that MetLife had repeatedly "received an adverse judgment for very similar conduct")

(citing <u>Glenn</u> and several other cases).

## III. <u>ORDER</u>

For the reasons hereinabove set forth, this Court concludes that the Administrator did not

engage in a principled reasoning process on remand or reach a reasonable result, but, rather,

abused its discretion, and that fees and costs are appropriate under the circumstances of this case.

Accordingly:

IT IS HEREBY ORDERED, ADJUDGED and DECREED THAT the Defendants'

Motion for Summary Judgment is **DENIED** and the Plaintiff's Motion for Summary Judgment is

**GRANTED**;

AND THAT Plaintiff is hereby granted an award of long-term disability benefits

commencing May 3, 2004 for the two-year eligibility period, subject to such offsets as are

permitted in the Plan, if any, together with prejudgement interest;[68]

_____

68. Direction for the instatement of long-term disability benefits is appropriate where, as here, the Administrator had opportunity (indeed, repeated opportunity) to review all medical and vocational evidence and did so in an arbitrary and capricious manner. <u>See</u>, <u>e.g.</u>, <u>Elms v. Prudential Insur. Co. of America</u>, 2008 WL 4444269, *8 (E.D. Pa. Oct. 2, 2008) (granting summary judgment for claimant) (citing <u>Post v. Hartford Ins. Co.</u>, 501 F.3d 154, 162 (3d Cir. 2007)); <u>Cohen v. Standard Ins. Co.</u>, 155 F.Supp.2d 346, 354-55 (E.D. Pa. 2001) (citing cases); <u>Sanderson v. Continental Casualty Corp.</u>, 2005 WL 2340741, *6 (D.Del. Sept. 26, 2005) (noting that to allow another opportunity for review after years of administrative proceedings, and prior remand, would "contravene the underlying policies of ERISA and invite similar dilatory behavior"); <u>Glenn v. MetLife</u>, 461 F.3d 660, 675 (6th Cir. 2006); <u>Kalish v. Liberty Mutual/Liberty Life Assurance Co. of Boston</u>, 419 F.3d 501, 506-507 (6th Cir. 2005). <u>Cf.</u> <u>Rudzinski</u>, 2007 WL 2746630, *20 (noting that retroactive award of benefits was appropriate

(continued...)

AND THAT Plaintiff is entitled to an award of attorney's fees and costs, with Plaintiff to file on or before March 30, 2009, an appropriate petition with supporting documentation, and Defendant may reply thereto on or before April 20, 2009.

**SO ORDERED** this 9th day of March, 2009.


 s/ Terrence F. McVerry
Terrence F. McVerry
United States District Judge


cc:     Joseph H. Chivers, Esquire
        Email: jchivers@employmentrightsgroup.com

         John David Collins, Esquire
        Email: jcollins@maynardcooper.com
        Sarah E. Diedrich, Esquire
        Email: sediedrich@schnader.com
        William B. Wahlheim , Jr., Esquire
        Email: wwahlheim@maynardcooper.com
        Ray F. Middleman, Esquire
        Email: middleman@mlmpclaw.com
        Terri Imbarlina Patak, Esquire
        Email: tpatak@schnader.com
        Veronica W. Saltz, Esquire
        Email: vsaltz@saltzpolisher.com

        The Honorable Lisa Pupo Lenihan

---

68.  (...continued)
where evidence strongly demonstrated MetLife's failure to provide plaintiff with a full and fair review of her claim and her entitlement to benefits).